**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction:  Chester County, PA

---

***RELATED CASE IF ANY:***  Case Number:_____  Judge:_____

1.  Does this case involve property included in an earlier numbered suit?                                                    Yes ☐

2.  Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?    Yes ☐

3.  Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?    Yes ☐

4.  Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same    Yes ☐
     individual?

5.  Is this case related to an earlier numbered suit even though none of the above categories apply?    Yes ☐
     If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.*  *Federal Question Cases:*

- ☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2.  FELA
- ☐ 3.  Jones Act-Personal Injury
- ☐ 4.  Antitrust
- ☐ 5.  Wage and Hour Class Action/Collective Action
- ☐ 6.  Patent
- ☐ 7.  Copyright/Trademark
- ☐ 8.  Employment
- ☐ 9.  Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief  **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

*B.*  *Diversity Jurisdiction Cases:*

- ☒ 1.  Insurance Contract and Other Contracts
- ☐ 2.  Airplane Personal Injury
- ☐ 3.  Assault, Defamation
- ☐ 4.  Marine Personal Injury
- ☐ 5.  Motor Vehicle Personal Injury
- ☐ 6.  Other Personal Injury *(Please specify)*:_____
- ☐ 7.  Products Liability
- ☐ 8.  All Other Diversity Cases:  *(Please specify)*_____
     _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| LEHIGH VALLEY TOXICOLOGY, LLC d/b/a LEHIGH VALLEY GENOMICS | CONTINENTAL CASUALTY COMPANY/CNA |

| (b) County of Residence of First Listed Plaintiff  Northampton | County of Residence of First Listed Defendant  Cook |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Hill Wallack LLP, 1000 Floral Vale Blvd., Suite 300, Yardley, PA 19067; (215) 579-7700 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [x] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine / Injury Product Liability | | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL PROPERTY** | **LABOR** | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | | [ ] 790 Other Labor Litigation | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | [ ] 550 Civil Rights | | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332

Brief description of cause:
Declaratory Action on a policy of insurance

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____  DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/18/2024 | |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEHIGH VALLEY TOXICOLOGY, LLC,** | ) | |
| **d/b/a LEHIGH VALLEY GENOMICS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | CIVIL ACTION NO. _____ |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CONTINENTAL CASUALTY** | ) | |
| **COMPANY/CNA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Lehigh Valley Toxicology, LLC, d/b/a Lehigh Valley Genomics (referenced hereinafter as "Plaintiff" or "LVG"), by and through its counsel, Hill Wallack LLP, hereby files this Complaint for Declaratory Judgement against Defendant, Continental Casualty Company/CNA (referenced hereinafter as "Defendant" or "CCC"), and in support thereof avers as follows:

**I.    JURISDICTION AND VENUE**

1.    This Court has jurisdiction over this matter under the Declaratory Judgment Act, 28 U.S.C. § 2201.

2.    Jurisdiction is further based on 28 U.S.C. § 1332(a)(1) as this action involves a controversy between citizens of different states and the amount in controversy exceeds the jurisdictional threshold of the Court. Specifically, the cost to Plaintiff to defend the action in the Chester County Pennsylvania Court of Common Pleas, further described below, for which Plaintiff here claims the Defendant, CCC, is responsible for providing defense coverage, will exceed $75,000.00. Furthermore, in underlying action, the plaintiff there asserts a claim in excess

$75,000.00, which LVG denies and for which LVG contends in this action that there is coverage by the policy of insurance at issue.

3.      Venue is proper under 28 U.S.C. § 1391 because the occurrence giving rise to the instant insurance coverage dispute took place within in the Eastern District of Pennsylvania and because Plaintiff, Lehigh Valley Genomics is located within this judicial district within the meaning of 28 U.S.C. § 1391(c)(2).

## II.    PARTIES

4.      Plaintiff, Lehigh Valley Toxicology, LLC, dba/Lehigh Valley Genomics is a Pennsylvania limited liability company with its principal place of business located at 2550 Brodhead Rd., Suite 202, Bethlehem, PA 18020.

5.      Defendant, Continental Casualty Company/CNA, is an Illinois Corporation with its principal place of business located at 1 North Franklin Street, Floor 9, Chicago, Illinois 60606.

## III.   STATEMENT OF FACTS

6.      This is a case of actual controversy involving whether an Insurance Policy ("Policy") issued to Plaintiff, LVG, by Defendant, Continental Casualty Company ("CCC"), requires CCC to provide coverage to LVG, or at least requires CCC to defend LVG in response to claims pending against LVG in the underlying lawsuit.

### A.    The Underlying Lawsuit

7.      The underlying lawsuit, captioned Advaite, Inc. v. Lehigh Valley Genomics, is pending in the Court of Common Pleas of Chester County, Pennsylvania, at Docket Number 2023-04736-MJ.

8.      Advaite, Inc. ("Advaite") filed a Complaint against Lehigh Valley Genomics (LVG), which includes the following four counts against LVG: Count I – Breach of Contract;

2

4863-2224-9722, v. 1

Count II – Tortious Interference; County III – Negligence; and Count IV – Commercial Disparagement and Trade Libel. (A copy of Advaite's Complaint, without exhibits, is attached hereto as Exhibit "A.") LVG answered the Complaint denying liability.

9.    Through its Complaint against LVG, Advaite asserts that LVG sent 19,000 letters, dated October 1, 2020, to all Chester County residents who were tested with Advaite's RapCov Covid-19 test kits in May 2020; alleging the letters stated that the test itself was unreliable. (Exhibit "A", ¶9.)

10.    Throughout the Complaint, Advaite repeatedly asserts that its claims against LVG are based on letters sent by LVG to Chester County residents reporting that there were issues with the RapCov test kits—Advaite claims such letters were disparaging (Exhibit "A", ¶¶ 19, 44, 51, 52-54):

> 44.    LVG's negligence in failing to properly inform residents of change test result strongly contributed to negative views of Advaite, which were further exacerbated by the letter LVG sent to over 19,000 residents in October 2020. (Id.)
>
> 54.    The discovery of LVG's misconduct of administering and reading RAP COV RapCov test along with the disparaging letter sent by LVG to Chester County residents months after discovering there were no false positives, further adds to LVG's liability to Plaintiff. (Id.)

11.    Advaite sets forth its contentions of disparagement by LVG in two separate Counts: Count III – Negligence and Count IV – Commercial Disparagement and Trade Libel.

12.    Count III – Negligence of Advaite's Complaint contains the following assertions:

> 65.    Further, Defendant LVG breached its duty when it failed to inform individuals who had been administered the RapCov tests when their test results were changed, instead falsely informing them months later that there was a defect in the RapCov test kits.
>
> 66.    Defendant LVG's breaches of duty damaged Plaintiff's reputation and its future business prospects. (Id.)

3

13.    Count IV – Commercial Disparagement and Trade Libel, contains the following assertions:

69.    Defendant LVG misinformed thousands of individuals who had been administered the RAP COV RapCov tests that the RAP COV RapCov test kits had a defect despite its corporate designee's admission under oath at her deposition that there were no issues with the RAP COV RapCov test kits.

70.    This misinformation was sufficiently disparaging and libelous, and LVG's conduct sufficiently wrongful, wanton, egregious, and or malicious, to warrant the award of compensatory damages to Plaintiff and the imposition of punitive damages against LVG.

## B.    **The Insurance Policy**

14.    Defendant, CCC, issued an Insurance Policy ("Policy") to LVG, as its insured, which covered the relevant period of July 1, 2020, to July 1, 2021 (A true and correct copy of the Commercial Umbrella Plus Coverage Part of the Policy is attached hereto as Exhibit "B.")

15.    The Policy as it relates to the underlying lawsuit filed by Advaite against LVG, includes the following relevant language concerning coverage:

9.    **"Incident"**

a.    With respect to "personal and advertising injury," "incident" means **an offense arising out of your business**. (bold added.)

10.    **"Personal and Advertising Injury"** means injury, including consequential "bodily injury" arising out of one or more of the following offenses:

e.    **Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's organization's goods, products or services**; (bold added). (Section V, Exhibit "B.").

4

## COUNT I – DECLARATORY JUDGMENT

17.     The allegations at Paragraphs 1 through 16 above are hereby incorporated by reference as if fully set forth herein.

18.     A case of actual controversy exists between the parties regarding whether an Insurance Policy ("Policy") issued to Plaintiff, LVG, by Defendant, Continental Casualty Company ("CCC"), requires CCC to provide coverage to LVG, and/or, at least requires CCC to defend LVG, in response to claims pending against LVG in the underlying lawsuit.

19.     The Policy provides coverage under the "Personal and Advertising Injury" provisions for an injury arising out of **"Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's organization's goods, products or services"** (bold added). (Section V,  Exhibit "B",  ¶10(e).)

20.     Advaite, throughout its Complaint against LVG in the underlying lawsuit, asserts claims of "disparaging and libelous" conduct by LVG, with specific reference to a letter alleged to have been sent by LVG to residents of Chester County in October 2020.

21.     The claims and damages alleged by Advaite against LVG in the underlying lawsuit are exactly the type of claims for which coverage is provided under the Policy.

22.     There exist no viable exclusions upon which coverage can be denied.

23.     To the extent that CCC claims that any exclusions arguably apply, which is denied by LVG, any alleged claims for exclusion are to be strictly construed against CCC, as the insurer, with any ambiguous insurance contract provisions to be construed in favor of their insured, LVG.

24.     Moreover, the duty of an insurer to defend its insured is broader than its duty to indemnify under coverage of the policy. The duty to defend is triggered when the factual

4863-2224-9722, v. 1

allegations of the complaint state a claim that could "potentially" fall within the coverage of the policy. The insurer has a duty to defend even if the complaint is groundless, false, or fraudulent.

25. Defendant, CCC, has continued to deny claims by its insured, LVG, for either coverage or defense, under the Policy.

26. Pursuant to 28 U.S.C. § 2201, Plaintiff, LVG, requests that this Court issue a declaratory judgment ruling that Defendant, CCC, is obligated to provide coverage for the claims asserted by Adviate against LVG in the underlying lawsuit under the terms of the Policy.

27. Pursuant to 28 U.S.C. § 2201, Plaintiff, LVG, requests that this Court issue a declaratory judgment ruling that Defendant, CCC, is obligated to defend LVG in the underlying lawsuit under the Policy, with Order of:

(a) payment of any costs going forward for the defense of LVG in the underlying lawsuit filed by Adviate to be issued by CCC, including attorneys' fees and any other related costs; and

(b) payment by CCC to LVG for any past costs incurred by LVG, including attorneys' fees and any other related costs, for LVG's defense in the underlying lawsuit filed by Adviate, Inc.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Lehigh Valley Toxicology, LLC, d/b/a Lehigh Valley Genomics, demands judgment in its favor, and against Defendant, Continental Casualty Company/CNA, with the following relief:

(a) Declare that Defendant, CCC, is obligated to provide coverage to LVG under the terms of the Policy for the claims asserted by Adviate against LVG in the underlying lawsuit;

6

4863-2224-9722, v. 1

(b)      Declare that Defendant, CCC, is obligated to defend LVG in the underlying lawsuit under the terms of the Policy;

(c)      Order that Defendant, CCC, is responsible for payment of any costs going forward for the defense of LVG in the underlying lawsuit filed by Adviate, including attorneys' fees and any other related costs; and

(d)      Order that Defendant, CCC, issue payment to LVG for any past costs incurred by LVG, including attorneys' fees and any other related costs, for LVG's defense in the underlying lawsuit filed by Adviate.

HILL WALLACK LLP

By: ***John J. Muldowney***
    John J. Muldowney, Esq.
    I.D. No. 56035
    jmuldowney@hillwallack.com
    Paul R. Sheehan, Esq.
    I.D. No. 91556
    psheehan@hillwallack.com
    1000 Floral Vale Blvd., Ste. 300
    Yardley, PA 19067
    P: (215) 579-7700
    *Attorneys for Plaintiff*

Dated: November 18, 2024

7

4863-2224-9722, v. 1

# EXHIBIT "A"

*Filed and Attested by*
*PROTHONOTARY*
*27 Mar 2024 11:49 AM*
*M. SCHIAVONI*

**MITTS LAW, LLC**
Maurice R. Mitts, Esq. (50297)
Geoffrey P. Huling, Esq. (75800)
Ashley Ann Garland, Esq. (331767)
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0112 (telephone)
(215) 866-0113 (facsimile)

*Attorneys for Plaintiff*
*Advaite, Inc.*

| | |
|---|---|
| **ADVAITE, INC.** | : |
| 5 Great Valley Parkway, Suite 125 | : |
| Malvern, PA 19355 | : COURT OF COMMON PLEAS |
| | : CHESTER COUNTY, PA |
| Plaintiff, | : |
| | : CIVIL ACTION |
| vs. | : |
| | : NO. 2023-04736-MJ |
| **LEHIGH VALLEY GENOMICS** | : |
| 2550 Brodhead Road, Suite 202 | : JURY TRIAL DEMANDED |
| Bethlehem, PA 19047, | |
| | |
| Defendant. | |

## COMPLAINT

### PARTIES

1.      Plaintiff, Advaite Inc., is a Pennsylvania corporation with an address at 5 Great Valley Parkway, Suite 125, Malvern, PA 19355.

2.      Upon information and belief, Defendant Lehigh Valley Genomics ("LVG") is a High Complexity Clinical Laboratory Improvement Amendments ("CLIA") Laboratory with an address at 2550 Brodhead Road, Suite 202, Bethlehem, PA 19047.

### NATURE OF THE ACTION

3.      This is an action alleging causes of action for the following: (1) breach of contract under Article 2 of the Pennsylvania Uniform Commercial Code, 13 P.S.A. 2101 *et*

*2023-04736-MJ*

*seq.*; (2) tortious interference; (3) negligence; and (4) commercial disparagement and trade libel.

4.    On January 15, 2021, Chester County ("the County") filed an action against Advaite, Inc. and Karthik Musunuri containing allegations that Advaite, Inc. breached a contract when Advaite allegedly failed to timely deliver RapCov COVID-19 Rapid Test Antibody Test Kits ("RapCov test kits") and failed to obtain emergency use authorization for such tests, which were to be administered for the benefit of the County's residents.

5.    The County filed an Amended Complaint on March 25, 2021.[1]

6.    Thereafter, Advaite filed a Counterclaim against the County because the County: (1) failed to, *inter alia*, pay Advaite $7 million due pursuant to the parties' contract; and (2) waged a defamatory media campaign against Advaite designed to impugn Advaite's reputation in the eyes of County residents and detract from its own wrongful conduct.[2]

7.    The County's defamatory media campaign included allegations that the RapCov test kits produced false positive test results and were otherwise unreliable. The County and LVG subsequently sent letters to approximately 25,000 residents who were tested with the RapCov test kit advising that the RapCov test kits' results were unreliable.

8.    Through discovery in the litigation between Chester County and Advaite, Plaintiff learned that the County contracted with LVG to facilitate antibody testing using RapCov test kits beginning in May of 2020 and that LVG contributed to the County's erroneous belief that the RapCov test kit produced false positives.[3]

---

[1] A true and correct copy of the County's Amended Complaint is attached hereto as **Exhibit A** for informational purposes, but its allegations are disputed by Advaite and are not adopted.

[2] A true and correct copy of Plaintiff's Second Amended Counterclaim is attached hereto as **Exhibit B**.

[3] A true and correct copy of the contract between the County and LVG is attached hereto as **Exhibit C**.

*2023-04736-MJ*

9.      On April 12, 2023, Plaintiff deposed Lisa Jackson, the Managing Partner and the Corporate Designee for LVG, who admitted that (1) LVG did not follow the RapCov test kits' Instructions for Use ("IFU") when LVG administered the antibody testing; (2) LVG's internal investigation into alleged false positives determined that there were no issues with the RapCov test kits, but rather the supposed false positives were the result of the improper use and reading of the RapCov test kits by LVG and County employees; (3) LVG changed the test results that had been "false positives" but never advised any of the patients that their previously communicated test results had been changed; and (4) despite knowing that there were no issues with the RapCov test kits' performance, on October 1,  2020, LVG sent 19,000 letters to all County residents who were tested with the RapCov test kit in May of 2020, stating that the test itself was unreliable – when LVG knew that it was its own incompetent performance that caused issues with the accuracy of the reported test results – a fact it concealed.

10.     On November 16, 2023, Plaintiff received a report from an audit completed by the Center for Medicare & Medicaid Services ("CMS") on August 24, 2020.[4] The audit found that LVG was deficient in eight areas when it administered and read the RapCov test kits for Chester County between May and June of 2020. These deficiencies included, *inter alia*, (1) failing to provide overall management and direction of the RapCov testing process; (2) failing to establish and maintain a quality control program to ensure the quality of services provided for RapCov testing; (3) failing to establish and maintain a quality assurance program to ensure the quality of services provided by LVG; and (4) failing to adequately train all 72 of the personnel tasked with performing the RapCov testing for the County.

---

[4] A true and correct copy of CMS's audit report is attached hereto as **Exhibit D**.

*2023-04736-MJ*

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over LVG pursuant to 42 Pa. C.S.A. § 5322(a)(1) as LVG conducts business in the Commonwealth of Pennsylvania and pursuant to 42 Pa. C.S.A. § 5322(a)(3), as the illegal and unlawful acts perpetrated by LVG occurred in the Commonwealth of Pennsylvania, including Chester County.

12.     Venue is proper in Chester County pursuant to Pa. R. Civ. P. 1006 and 2179(a)(2), as LVG provided services in May of 2020 in Chester County pursuant to the contract between the County and LVG.

## FACTUAL BACKGROUND

13.     This dispute initially arose from the County's wrongful termination of its contract with Advaite to purchase 1,000,000 units of its RapCov test kits in the spring-summer of 2020, during the early stages of the COVID-19 pandemic in the United States.

14.     In early 2020, Advaite developed and began manufacturing its RapCov test kits, designed to detect COVID-19 antibodies in individuals by analyzing fingerstick blood samples.

15.     The County initially ordered 10,000 RapCov test kits from Advaite to beta test the product and, after finding them appropriate for the County's needs, thereafter contracted to purchase 1,000,000 kits for $20,000,000 (a $9,000,000 discount), as set forth in an April 8, 2020 Purchase Order (the "Purchase Order," a true and correct copy of which is attached hereto as **Exhibit E**).

16.     In order to utilize the RapCov test kits, the County needed a laboratory with a CLIA certification to administer the testing to patients.

4

17.     On or about May 6, 2020, the County finalized a contract with LVG to facilitate the testing and read the results of the RapCov tests administered to Chester and Delaware County residents. *See* Exhibit D.

18.     Between May 7, 2020 and June 2, 2020, LVG tested over 19,000 Chester and Delaware County residents with the RapCov test kits.

19.     On April 19, 2023, in a deposition of LVG's Managing Partner, Lisa Jackson, Plaintiff discovered for the first time that (1) LVG did not adhere to the RapCov test kits' IFU, (2) LVG investigated alleged false positive RapCov test results that the County reported concerns about and found no issue with the RapCov test kits, and (3) despite determining there was no issue with the RapCov test kit or the results of the tests used, LVG sent every test recipient a letter alleging that there were defects with the RapCov test kits.

20.     LVG's actions constitute actionable misconduct and undermined the relationship between Advaite and the County.

21.     Additionally, LVG's misconduct unfairly disparaged Advaite, damaging Advaite's reputation and negatively impacting Advaite's existing and future business relationships.

A.  **LVG Deliberately Ignored Advaite's IFU for the RapCov Test Kits, Creating Issues with the Reading of Results.**

22.     An IFU is an FDA-mandated document included with medical devices which provides specific instructions for the proper and approved manner to utilize the product.

23.     Advaite included an IFU with the RapCov test kits, which specified the test's intended use, kit components, precautions, storage and shelf life of reagents, interpretation of the results, test limitations, a troubleshooting guide, performance evaluation data, quality control, and the assay procedure.[5]

---

[5] A true and correct copy of the RapCov test kits' IFU is attached hereto as **Exhibit F**.

5

*2023-04736-MJ*

24.     The assay procedure section of the IFU outlines how to administer the RapCov test kit, including the instruction to "[r]ead the result **exactly 15 minutes** after adding the buffer to the cassette…**Do not read results after 20 minutes**." *See* Exhibit F (emphasis added).

25.     LVG was fully aware of these strict instructions for use of the RapCov test before it ever administered a single RapCov test.

26.     As a condition to be permitted by the Pennsylvania Department of Health, Bureau of Laboratories to administer *any* RapCov test, LVG was required to conduct a validation study as part of the process of adding the test to the laboratory's CLIA certification.

27.     The validation study tested twenty patients with both a PCR test and the RapCov test kit to determine if the RapCov test kit produced the same result as the PCR test.

28.     The validation study required LVG to read the RapCov test kits at the 15-minute mark, which is precisely what LVG did. *See* LVG's validation study, attached hereto as **Exhibit G**, (reading, "The laboratory will follow all manufactures [sic] instruction for use…").

29.     Ms. Jackson confirmed in her deposition that LVG read the RapCov tests at the 15-minute mark in the validation study it submitted to the Pennsylvania Department of Health, Bureau of Laboratories.

> Q. Okay. Tell me how you -- as I
> understand it, you drew blood from, you just
> mentioned, six people?
> A. Yes.
> Q. Okay. What did you do next with
> respect to the Advaite test?
> A. I performed that test as well.
> Q. How did you do that?
> A. A fingerstick.
> Q. Uh-hmm.
> A. And then did it, you know, put it on
> the test kit, the blood, and waited the time
> period that they asked me to wait per the
> insert, the insert of the test kit.

Q. Okay. And what was that time period?
A. Fifteen minutes.

*See* Lisa Jackson Dep. Tr. Excerpts, attached hereto as **Exhibit H**, at 54:1-16.

30.    LVG's validation summary confirmed that "[t]he ADVAITE RapCov COVID-19 Rapid Test Kit has been successfully validated."

31.    Only after LVG submitted the validation study to the Pennsylvania Department of Health was it able to add the RapCov test kit to its CLIA certification.  *See* Exhibit H at 184:24-185:5 (testifying LVG submitted its final validation study around May 3, 2020).

32.     Plaintiff later discovered that, once LVG began receiving Chester County residents' RapCov test kits, LVG deliberately ignored Advaite's clear IFU and LVG's own validation study, both of which LVG was required to follow, and read the RapCov test kit results at the 30-minute mark -- double the approved time for reading the results.

33.    During her deposition, Ms. Jackson revealed for the first time that LVG did not follow Advaite's IFU. In fact, Ms. Jackson admitted that LVG was reading the RapCov test results at the 30-minute mark.

Q. Okay. Do you see on the second
sentence, do you see where it says "RapCov
COVID-19 test"?
A. Yes.
Q. Okay. And underneath that, the
second sentence says, "The results are
available in 15 minutes"?
A. Yes, I do.
Q. Okay. And I'd like you to look at
the, uh --— do you see there's three images
on the bottom?
A. Uh-hmm.
Q. Uhm, do you see the third of those
images is also an indication for 15 minutes?
A. Yes.
Q. Did you ever see any document from
Advaite providing new instructions for use

*2023-04736-MJ*

of the test for any period other than 15 minutes?
A. No. Just us talking and the control line not showing up on the test kit at 15 minutes.
Q. Okay. I'm asking did you see any documents.
A. No.

*See* Exhibit H at 109:14-110:14.

34.   In addition to reading the results at an unapproved time, LVG also used impermissible methods of reading the test.

35.   Ms. Jackson admitted in her deposition that test results were being read and confirmed via photograph, which was not permitted in the IFU, and LVG never received permission to read the results in that manner.

Q. Is there anything in the IFU that said that the tests could be read by photograph? The Instruction for Use from the manufacturer.
A. I'm not sure.
Q. Do you have any communication from the manufacturer authorizing that method of reading the test?
A. No. They know our method, and they referred to our method with other -- I know that they -- we've give -- we gave them the contact we have for Formstack for further clients to use the, the method that we use.
Q. What was communicated when about the use of photographs to read tests?
A. So during the conversations that we -- I had with Mr., the --
Q. Musunuri?
A. Yes. He, he asked how, just the way that we perform this, like how we were able to do the drive-throughs, and I told him we used software called "Formstack" and the procedures that we did and took pictures of it; and he just asked me for the name of the

8

*2023-04736-MJ*

software we used.
And not to sell his product or
anything. I'm just saying to, I guess, he
was asking for other clients.
Q. When are you saying this conversation
happened, this one that you just mentioned?
A. So, this is just a conversation that
he and I had during him and I talking about
the test kits. Like, it was, what, the
20th.
Q. Okay.
A. Of May.

*See* Exhibit H at 270:24-272:11.

36.    Although Ms. Jackson claimed Mr. Musunuri knew of LVG's procedure (which is strenuously disputed by Advaite), even her story has LVG making this supposed disclosure weeks *after* LVG began administering the RapCov tests for the County.

37.    LVG misused Advaite's RapCov test kits when administering testing for the County, and this misuse led to confusion and inaccuracies in reading the test results.

B.   After the County Began to Claim RapCov was Producing False Positives, LVG Investigated and Found No Issues with the Test Kit or Results.

38.    On or about May 29, 2020, a County official emailed LVG officials, reporting a higher rate of positive RapCov test results than previously seen.[6]

39.    An LVG employee responded to the County's email, stating:

We will reach out [sic] the manufacturer to discuss. Pending review and discussion with the manufacturer, the change in the way the kits are performing will need to be notified to CLIA and state health department. They might ask us to revalidate or shut down until this can be further investigated. We will [sic] in touch Monday in regards to this.

---

[6] A true and correct copy of the May 29, 2020 email is attached hereto as **Exhibit I**.

9

40.     As a result of this May 29, 2020 exchange, LVG decided to review pictures of the photographs of every RapCov test kit used to determine if the positive results were, in fact, positive; this led to LVG changing the result of many tests from positive to negative.

> BY MR. MITTS:
> Q. I'm handing you a one-paged document we've marked as Exhibit 40. Uh, this appears to be a communication from, uh, Samantha Esser to you, uh, providing update. And she says, "Here are a list of the samples I've changed so far."
> A. Uh-hmm.
> Q. I, "I have more I'm still going through. There's 273. I have about 500 positives left. In the column that's gray is where you can see what I've changed it to or a note. If you click the link next to it, you can see the picture of the test kit."
> Is this, uh -- first, did I read that accurately?
> A. Yes.
> Q. Okay. Is this, uh, an effort by Lehigh Valley Genomics to, uh, alter the conclusion of positive/negative? Is that what this is?
> …
> THE WITNESS: To, yeah, to go back, and anything that had a squiggly line, yes.
> BY MR. MITTS:
> Q. Okay. So things that had been previously flagged as positive were now being, uh, listed as negative?
> A. Correct.

*See* Exhibit H at 272:19-274:2.

41.     Ms. Jackson testified that LVG informed the County of these changes, but LVG never produced any documents evidencing such communication despite being under subpoena.

10

42.     Additionally, Ms. Jackson admitted for the first time in her deposition that LVG did not notify any individuals who had been administered the RapCov test when their test results changed.

> BY MR. MITTS:
> Q. When the data was changed, uh, uhm, as it was reviewed in, uh, response to the May 21st communication from Dr. Cassidy, at that time was there new information sent to the patients to advise them of the changed conclusion?
> A. Yes.
> …
> Q. Did you understand my question?
> A. You're asking, if we changed the test result, did we notify the patient?
> Q. Yes.
> …
> THE WITNESS: We would --
> …
> BY MR. MITTS:
> Q. Changed the conclusion. I'm sorry.
> A. Yeah. No data was ever changed. When you say "the conclusion," what do you mean by it?
> Q. The conclusion, positive versus negative.
> A. If, if, if we re-read a test and it was going to be changed to positive?
> Q. No. From positive to negative.
> A. Did we inform the patient?
> Q. Yes.
> A. We just, we just would -- I don't, I don't recall.
> Q. Okay.
> A. Because we didn't -- maybe you could just ask me the question --
> Q. Sure, sure.
> A. -- again.
> Q. Yeah. I'm going to find the document. It'll help us. Ah, here. So, uh, why don't you grab Exhibit, uh, I believe it's, Exhibit 40.

11

> Do you see that? This is the
> one-page, uhm, document. Uh, it's LV00671,
> and this is the email communication from
> Samantha Esser to you.
> A. Uh-hmm.
> Q. And she says, "Here are the list of
> samples I've changed so far." So, she's
> changing something. "I have more I'm still
> going through. There are 273. I have about
> 500 positive lefts. In the column that's
> gray is where you can see what I've changed
> it to or a note. If you click the link next
> to" it -- "next to, you can see the picture
> of the test kit."
> A. So, we didn't, we -- so, we, we did
> not notify the patient that anything was
> changed.
> Q. Okay. Is there a reason why not?
> A. No. I think Chester County, uhm,
> might have noti -- there's no reason.

*See* Exhibit H at 300:22-303:15.

43.     Finally, Ms. Jackson admitted unequivocally that there were no issues with the

RapCov test kits.

> Q. Okay. But you never came to a
> conclusion that there was something wrong
> with the tests?
> A.  No.

*Id*. at 174:16-19.

44.     LVG's negligence in failing to properly inform residents of changed test results

strongly contributed to negative views of Advaite, which were further exacerbated by the letter

LVG sent to over 19,000 residents in October 2020.

12

C.  CMS Audits LVG's Use of the RapCov Test Kits and Finds LVG is Responsible for a Multitude of Deficiencies in How it Administered the Tests.

45.    On August 24, 2020, CMS performed an audit, specifically to assess LVG's competency in administering RapCov for the County between May and June of 2020. *See* Exhibit D at 11-22.  Those audit results were recently produced to Advaite in response to a FOIA request.

46.    Following its audit, CMS issued a report detailing eight areas in which LVG was deficient during the period it administered RapCov for the County.

- "Based on review of laboratory policies, RapCov rapid COVID-19 manufacturer's instructions, Laboratory Service Agreement and interview with the Managing Partner (MP), the laboratory failed to monitor and evaluate the overall quality of the analytic systems and correct problems as required in §493.1251 through 493.1283 for SARS-CoV-2 antibody testing performed from 05/07/2020 to 06/02/2020." *See* Exhibit D at 11.

- "Based on review of laboratory policies and interview with the Managing Partner, the Laboratory Director (LD) failed to approve, sign, and date 7 of 7 procedures reviewed at the time of survey." *Id*. at 12.

- "Based on lack of Quality Control (QC) documentation, RapCov rapid COVID-19 manufacturer's instructions, Laboratory Service Agreement (page 11), and interview with the Managing Partner (MP), the laboratory failed to include external positive and negative QC materials in the RapCov Rapid Covid 19 testing performed at the Chester County testing sites as required from 5/7/2020 to 6/2/2020." *Id*. at 13.

- "Based on review of Patient Test Report and telephone conversation with the technical supervisor (TS), the laboratory failed to include on patient test reports the

13

location and report date for the Advaite RapCov rapid COVID-19 antibody testing performed at offsite locations from 05/07/2020 to 06/02/2020 (20 of 20 patient tests reports reviewed)." *Id*. at 15.

- "Based on lack of documentation, review of laboratory procedures and the Laboratory Service agreement and interview with the Manager Partner (MP), the Laboratory Director (LD) failed to provide overall management and direction in accordance with 42CFR493.1445." *Id*. at 18.

- "Based on lack of quality control (QC) records, Laboratory Service agreement, and the laboratory RapCov rapid Covid-19 procedure and interview with the Managing partner, the Laboratory Director (LD) failed to ensure that a QC program was established, and maintained to ensure the quality of services provided for the RapCov Covid 19 testing on 30 of 30 days at the Chester County testing sites." *Id*. at 18-19.

- "Based on lack of Quality Assurance (QA) documentation, QA policy section QM policy 001 reviewed, and interview with the Managing Partner (MP), the Laboratory Director (LD) failed to ensure a QA program, was established and maintained to ensure the quality of services provided by the laboratory." *Id*. at 19-20.

- "Based on review of training records, the Laboratory Service Agreement and interview with the Managing Partner, the laboratory director (LD) failed to ensure that the 72 of 72 testing personnel (TP) who performed RapCov rapid Covid 19 High Complexity testing at Chester County testing sites received appropriate

14

*2023-04736-MJ*

training and demonstrated that they could perform all testing reliably and report accurate results from May 2020 to June 2020." *Id*. at 21.

47. LVG was required to acknowledge these deficiencies by submitting a plan with corrective actions for each identified deficiency, demonstrating how it would prevent such errors in future services. *Id*. at 1-10.

48. In its corrective action statements, LVG acknowledged that each "deficient practice affected 19,418 of 19,418 patients who were tested…" *Id*. at 2-4, 6, 8, 10.

49. LVG failed to properly administer the RapCov test kits between May and June of 2020, impacting *every single* patient tested. Despite the clear deficiencies in its services, LVG failed to take responsibility for its errors, either publicly or privately, choosing instead to blame Advaite and the RapCov test kits for any problematic test results.

D. Despite Determining that There Were No Issues with the Test Kits and that LVG Failed to Meet its Obligations as a Laboratory, LVG Informed all Test Result Recipients that the <u>RapCov Test Kits Had a Defect.</u>

50. Incredibly, instead of notifying residents of the change in test results and LVG's own errors, LVG sent a letter to every Chester County resident LVG tested using RapCov in May of 2020 to inform them that their test results may have been wrong due to issues with the manufacturing of RapCov.[7]

51. The letter included language that, "Lehigh Valley Genomics has reason to believe that the quality of the test reagents was not reliable and is unable to confirm the result you received was accurate." *See* Exhibit J.

52. This letter, sent on October 1, 2020, *four months* after LVG learned that there were no false positives, was sent only to satisfy a requirement for LVG to maintain its CLIA designation.

---

[7] A true and correct copy of the letter LVG sent to residents is attached here to as **Exhibit J**.

*2023-04736-MJ*

BY MR. MITTS:
Q. Uh, before we took the break, I was asking you about, uhm, uh, the, uh, inspection by CLIA.
And, uhm, was there -- were there any things that Lehigh Valley Genomics had to do in order to get recertified by CLIA in 2020?
A. To get re -- oh, so, not get recertified. Just to -- just actions that we had to correct.
Q. Yes.
A. So we had --
Q. Better, better way to say it. Thank you.
A. Yes. So, they just wanted to -- us, we had to take the, the RapCov test kit off of our CLIA license.
Q. Uh-hmm.
A. So, we had to show proof that we removed it from our license. And then we also, any patients that we tested, they wanted us to just send a letter out saying that we, you know, just that we believed that, uhm, we aren't a hundred percent sure that the tests were accurate and if you feel, uhm, that your tests were not correct, to please contact Chester County.

*See* Exhibit H at 163:9-164:11.

53.     LVG blatantly disregarded the results of its own investigation that showed RapCov did not produce false positives, and instead failed to properly inform County residents when their test results changed. To maintain its own reputation and its CLIA certification, LVG then knowingly and falsely disparaged Advaite by sending a letter to County residents alleging deficiencies with the RapCov test kit that LVG had no good-faith belief actually existed.

54.     The discovery of LVG's misconduct in administering and reading RapCov tests, along with the disparaging letter sent by LVG to Chester County residents months after discovering there were no false positives, further adds to LVG's liability to Plaintiff.

16

**CLAIMS FOR RELIEF**

COUNT 1 – BREACH OF CONTRACT

55.    The preceding paragraphs are incorporated by reference as though fully set forth herein at length.

56.    Advaite was an intended beneficiary of the contract between Defendant LVG and the County.

57.    Defendant LVG breached its contract with the County by failing to perform services properly in (1) ignoring Advaite's IFU, (2) failing to adhere to its own validation study submitted to Pennsylvania's Department of Health, and (3) improperly responding to the County's allegations of false positives.

58.    LVG's breach and wrongful conduct directly impacted Advaite's contract with the County, contributing to the County's desire to terminate the County's contract with Advaite and fueling the County's stated false belief that Advaite had breached its contract with the County by providing unreliable test kits.

59.    Advaite has suffered monetary damages resulting from LVG's conduct and LVG's breach of its own contract with the County including, but not limited to, lost income and income potential.

COUNT 2 – TORTIOUS INTERFERENCE

60.    The preceding paragraphs are incorporated by reference as though fully set forth herein at length.

61.    Defendant LVG has tortiously interfered with Advaite's contractual and/or economic relations by, among other things, failing to properly inform the County that there were no false positive results, contributing to the County's desire to attempt to terminate its contract

17

with Advaite and fueling the County's false belief that Advaite had breached its contract with the County by providing unreliable test kits.

62.    Defendant's tortious interference with Advaite's contractual and/or economic relations was sufficiently wrongful, wanton, egregious, and/or malicious to warrant the imposition of punitive damages.

## COUNT 3 – NEGLIGENCE

63.    The preceding paragraphs are incorporated by reference as though fully set forth herein at length.

64.    Defendant LVG had a duty to perform laboratory services accurately and properly. LVG breached this duty when it ignored Advaite's IFU and its own validation study.

65.    Further, Defendant LVG breached its duty when it failed to inform individuals who had been administered the RapCov test when their test results were changed, instead falsely informing them four months later that there was a defect in the RapCov test kits.

66.    Defendant LVG's breaches of duty damaged Plaintiff's reputation and its future business prospects.

67.    Defendant LVG's conduct as alleged herein was sufficiently wrongful, wanton, egregious, and/or malicious to warrant the imposition of punitive damages.

## COUNT 4 – COMMERICAL DISPARAGEMENT AND TRADE LIBEL

68.    The preceding paragraphs are incorporated by reference as though fully set forth herein at length.

69.    Defendant LVG misinformed thousands of individuals who had been administered the RapCov test that the RapCov test kits had a defect despite its Corporate Designee's admission under oath at her deposition that there were no issues with the RapCov test kits.

18

70.     This misinformation was sufficiently disparaging and libelous, and LVG's conduct sufficiently wrongful, wanton, egregious, and/or malicious, to warrant the award of compensatory damages to Plaintiff and the imposition of punitive damages against LVG.

WHEREFORE, Plaintiff Advaite, Inc. respectfully requests that this Honorable Court enter judgment in its favor and against Defendant Lehigh Valley Genomics, and award all available relief for the claims set forth herein, including:

(1) Compensatory damages;

(2) Punitive damages; and

(3) Such other relief as the Court deems just and proper.

Respectfully submitted,

Dated:  March 27, 2024                     **MITTS LAW, LLC**

/s/ Maurice R. Mitts
Maurice R. Mitts, Esq. (50297)
Geoffrey P. Huling, Esq. (75800)
Ashley Ann Garland, Esq. (331767)
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110 (telephone)
(215) 866-0111 (facsimile)

*Attorneys for Plaintiff Advaite, Inc.*

19

*2023-04736-MJ*

## VERIFICATION

I hereby state that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. This Verification is given subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: March 26, 2024

DocuSigned by:

KARTHIK MUSUNURI

*2023-04736-MJ*

# EXHIBIT "B"



G-15057-C
(Ed. 06/05)

# COMMERCIAL UMBRELLA PLUS
# COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured identified under **SECTION II – WHO IS AN INSURED** of this policy.

The word "insured" means any person or organization qualifying as such under **SECTION II – WHO IS AN INSURED.**

The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V – DEFINITIONS.**

## SECTION I – COVERAGES

### 1. Insuring Agreement

We will pay on behalf of the insured those sums in excess of "scheduled underlying insurance," "unscheduled underlying insurance" or the "retained limit" that the insured becomes legally obligated to pay as "ultimate net loss" because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.

**a.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "incident" anywhere in the world;

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** With respect to "bodily injury" or "property damage" that continues, changes or resumes so as to occur during more than one policy period, both of the following conditions are met:

**(i)** Prior to the policy period, no "authorized insured" knew that the "bodily injury" or "property damage" had occurred, in whole or in part; and

**(ii)** During the policy period, an "authorized insured" first knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

For purposes of this Paragraph **(1) a.(3)** only, if **(a)** "bodily injury" or "property damage" that occurs during this policy period does not continue, change or resume after the

termination of this policy period; and **(b)** no "authorized insured" first knows of this "bodily injury" or "property damage" until after the termination of this policy period, then such first knowledge will be deemed to be during this policy period.

**b.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any "authorized insured" includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**c.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any "authorized insured":

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand, claim or "suit" for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** This insurance applies to "personal and advertising injury" caused by an "incident" committed anywhere in the world during the policy period.

If we are prevented by law, statute or otherwise from paying on behalf of the insured, then we will indemnify the insured for those sums that the insured is legally obligated to pay as "ultimate net loss" because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies.

### 2. Exclusions

This Insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property. This exclusion does not apply to Employers Liability claims for "bodily injury" covered by "scheduled underlying insurance."

**b. Contractual Liability**

"Bodily injury," "property damage" or "personal and advertising injury" for which the insured is obligated to pay damages by reason of the

assumption of liability in a contract or agreement. This exclusion does not apply to liability for "ultimate net loss":

(1) That the insured would have in the absence of the contract or agreement; or

(2) Because of "bodily injury" or "property damage" assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

c. **"Personal and advertising injury" Exclusions**

"Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of a criminal act committed by or at the direction of the insured;

(5) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(6) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(7) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(8) Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights;

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan;

(9) Committed by an insured whose business is:

(a) Advertising, broadcasting, publishing or telecasting;

(b) Designing or determining content of websites for others; or

(c) An Internet search, access, content or service provider;

However, this exclusion does not apply to paragraphs **10. a., b.** and **c.** of "personal and advertising injury" under **SECTION V – DEFINITIONS**;

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

(10) Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control; or

(11) Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

d. **Workers' Compensation and Similar Laws**

Any obligation of the insured under a:

(1) Workers' compensation;

(2) Disability benefits; or

(3) Unemployment compensation

law or any similar law.

e. **Employers Liability**

"Bodily injury" to:

(1) An employee of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that employee as a consequence of **(1)** above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply:

(1) To liability assumed by the insured under an "insured contract"; or

(2) Only to the extent that coverage is provided by "scheduled underlying insurance."



G-15057-C
(Ed. 06/05)

**f.  Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(i)** If the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

**(ii)** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants."

**(e)** That are, or that are contained in property that is:

**(i)** Being transported or towed by, or handled for movement into, onto or from a covered "automobile";

**(ii)** Otherwise in the course of transit;

**(iii)** Being stored, disposed of, treated or processed in or upon the covered "automobile";

**(f)** Before the "pollutants" or property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "automobile"; or

**(g)** After the "pollutants" or property in which the "pollutants" are contained are moved from the covered "automobile" to the place where they are finally:

**(i)** Delivered;

**(ii)** Disposed of; or

**(iii)** Abandoned

by the insured.

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

Subparagraph **(d)(i)** does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants, or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Subparagraph **(e)(iii)** does not apply to fuels, lubricants, fluids, exhaust, gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "automobile" or its parts if the "pollutants" escape or are discharged, dispersed or released directly from an "automobile" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants."

Subparagraphs **(f)** and **(g)** do not apply if the "pollutants" or property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "automobile" and the discharge, dispersal, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**(2)** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.



G-15057-C
(Ed. 06/05)

**(3)** Any loss, cost or expense arising out of any:

  **(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

  **(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

**g. Watercraft**

"Bodily injury" or "property damage" arising out of the:

**(1)** Ownership;

**(2)** Maintenance;

**(3)** Use; or

**(4)** Entrustment to others

of a "watercraft" owned or operated by or rented or loaned to an insured. Use includes operation or "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "incident" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A "watercraft" while ashore on premises you own or rent;

**(2)** A "watercraft" you do not own that is:

  **(a)** Less than 55 feet long; and

  **(b)** Not being used to carry persons or property for a charge; or

**(3)** Liability assumed under an "insured contract" for the ownership, maintenance or use of "watercraft."

**h. Aircraft**

The ownership, maintenance, operation, use, entrustment to others or "loading or unloading" of any "aircraft":

**(1)** Owned by an insured; or

**(2)** Chartered without crew by an insured or on an insured's behalf.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "incident" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any "aircraft" that is owned or operated by or rented or loaned to any insured.

**i. War**

Any liability arising out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage to Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.



Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k. Damage to your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to you Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. E.R.I.S.A.**

Liability for alleged or actual violations of the Employees Retirement Income Security Act of 1974 or any amendments or additions thereto.

**p. Directors and Officers**

Liability for a wrongful act, error, omission or breach of duty by an insured in the performance of the office of director or officer of an organization.

**q. Uninsured/Underinsured Motorist and Similar Laws**

Liability imposed on the insured under an uninsured/underinsured motorist law, a personal injury protection law, a reparations benefit law or other similar law.

**r. Electronic Data**

Any liability arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data."

**s. Nonemployment Related Discrimination**

To any alleged or actual nonemployment related discrimination committed intentionally against a person.

**t. Asbestos**

**(1)** "Bodily Injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened exposure at any time to "asbestos"; or

**(2)** Any loss, cost or expense that may be awarded or incurred:

**(a)** By reason of a claim or "suit" for any such injury or damage; or

**(b)** In complying with a governmental direction or request to test for, monitor, clean up, remove, contain or dispose of "asbestos."

**u. Fungi and Microbes**

**(1)** "Bodily injury," "property damage" or "personal and advertising injury," which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi or microbes"; or

**(2)** Any loss, cost, or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assessing the effects of "fungi or microbes" by any insured or by anyone else.

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage, loss, cost or expense.

**v. Silica**

**(1)** "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica;" or

G-15057-C
(Ed. 06/05)

**(2)** "Personal and advertising injury" or "property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica."

**w. Named Insured vs. Named Insured**

Any liability arising out of claims or "suits" by a named insured against another named insured.

**x. Employment Related Practices**

Any liability arising out of:

**(1)** A refusal to employ;

**(2)** Termination of employment;

**(3)** Demotion, evaluation, reassignment, discipline;

**(4)** Coercion, defamation, discrimination, harassment or humiliation; or

any other employment related practices, policies, acts or omissions.

**y. Terrorism Limitation**

"Bodily injury" or "property damage" arising out of any act of terrorism, unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

**z. Liquor Liability Limitation**

"Bodily injury" or "property damage" for which an insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

**aa. Auto and Mobile Equipment Limitation**

Any liability arising out of the:

**(1)** Ownership;

**(2)** Maintenance;

**(3)** Use; or

**(4)** Entrustment to others

of an "automobile" or "mobile equipment" owned or operated by or rented or loaned to an insured unless, and then only to the extent that coverage is provided by "scheduled underlying insurance."

To the extent that this insurance applies to an "automobile" or "mobile equipment" it is further subject to the pollution exclusion, exclusion **f.** of this policy.

Use includes operation or "loading or unloading."

**bb. Do Not Call**

Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or the CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## SECTION II – WHO IS AN INSURED

**1.** Named Insured means any individual or organization stated in the Declarations of this policy and if you are designated in the Declarations of this policy as:

**a.** An individual, you and your spouse, but only with respect to the conduct of a business of which you are the sole owner.

If you are designated in the Declarations of this policy as an individual, this policy shall not apply to liability arising out of your domestic or non-business activities. This does not apply to the ownership, maintenance, use or "loading or unloading" of any "automobile," or to the Personal Umbrella Liability Coverage Part.

**b.** A partnership or joint venture, you and your members, your partners, and their spouses, but only with respect to the conduct of your business.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**c.** An organization other than a partnership or joint venture, you and your executive officers and directors, but only with respect to their duties as your officers or directors. Your stockholders are also named insureds, but only with respect to their liability as stockholders.

**d.** A limited liability company, you and your members, but only with respect to the conduct of your business. Your managers are also named insureds but only with respect to their duties as your managers.



No person or organization is an insured with respect to the conduct of any current or past limited liability company that is not shown as a Named Insured in the Declarations.

e. A corporation or organization, other than partnerships, joint ventures or limited liability companies, that you form, acquire or gain control of during the policy period, but only with respect to "bodily injury," "property damage" or "personal and advertising injury" taking place after you form, acquire or gain control of such corporation or organization.

2. Insured means the Named Insured and:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your employees, other than your executive officers and directors (if you are an organization other than a partnership, joint venture or limited liability company) or your members (if you are a limited liability company ) but only for acts within the scope of their employment by you or while performing duties related to the conduct or your business. However, none of these employees or "volunteer workers" is an insured for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you; to your partners or members (if you are a partnership or joint venture) to your members (if you are a limited liability company) or to a co-employee while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-employee or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by;

(b) Rented to, in the care, custody or control or, or over which physical control is being exercised for any purpose by

you, any of your employees, "volunteer workers" any partner or member (if you are a partnership or joint venture) or any member (if you are a limited liability company).

b. A person or organization for whom you are required, by virtue of a written contract entered into prior to the "bodily injury," "property damage" or "personal and advertising injury" occurring or being committed, to provide the insurance that is afforded by this policy. This insurance applies only with respect to operations by you or on your behalf or to facilities you own or use, but only to the extent of the limits of insurance required by such contract, not to exceed the limits of insurance in this policy.

c. Any other persons or organizations included as an insured under the provisions of the "scheduled underlying insurance" shown in the Declarations of this policy and then only for the same coverage, except for limits of insurance, afforded under such "scheduled underlying insurance."

However, If a blanket additional insured endorsement is attached to the general liability "scheduled underlying insurance" pursuant to a written or oral contract or agreement between you and another person or organization (called additional insured), this insurance is excess over such insurance provided to the additional insured subject to the following conditions:

(1) If the limits specified in the written contract or agreement are less than the limits provided by the "scheduled underlying insurance," then no coverage is provided to the additional insured under this policy.

(2) If the limits specified in the written contract or agreement are greater than the limits provided by the "scheduled underlying insurance," then this insurance is excess over the insurance provided by the "scheduled underlying insurance." The limits of insurance for the additional insured are the lesser of:

(i) The limits specified in the written contract; or

(ii) The limits of the "scheduled underlying insurance" plus the limits of this policy.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought;

c. Persons or organizations making claims or bringing "suits."

d. "Automobiles," "aircraft" or "watercraft" to which this policy applies; or

e. Coverages under which loss is insured in this policy.

2. The limit of insurance shown in the Declarations as the Aggregate Limit is the most we will pay for the sum of all "ultimate net loss," to which this insurance applies and applies separately to all "ultimate net loss":

a. Included in the "products-completed operations hazard";

b. To which, and in the same manner, an aggregate limit applies under "scheduled underlying insurance" other than "ultimate net loss" included in the "products-competed operations hazard"; and

c. To which no "scheduled underlying insurance" applies.

The Aggregate Limit does not apply to "ultimate net loss" for which no aggregate limit applies in the "scheduled underlying insurance."

3. Subject to 2. above, the limit of insurance shown in the Declarations as the Each Incident limit is the most we will pay for the sum of all "ultimate net loss" to which this insurance applies arising arising out of any one "incident."

4. In the event of reduction or exhaustion of the aggregate limits of insurance under "scheduled underlying insurance" solely by reason of payments of a combination of covered:

a. Expenses;

b. Settlements; or

c. Judgments

paid thereunder as a result of "bodily injury," property damage" or "personal and advertising injury" taking place during this policy period, this policy shall, subject to this limit of insurance provision and to the remaining terms and provisions and conditions of this policy:

a. Apply in excess of such reduction of "scheduled underlying insurance"; or

b. Apply in place of the exhausted amount of "scheduled underlying insurance."

Nothing in a. or b. above shall serve to increase the limits of insurance shown in the Declarations.

5. The limits of this policy shall apply separately to:

a. Each consecutive annual period; and

b. Remaining periods of less than 12 months;

starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less

than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the limits of insurance.

## SECTION IV – CONDITIONS

1. **Financial Impairment**

Bankruptcy, rehabilitation, receivership, liquidation or other financial impairment of you or an "underlying insurer" shall neither relieve nor increase any of our obligations under this policy.

In the event there is diminished recovery or no recovery available to you as a result of such financial impairment of an insurer providing "scheduled underlying insurance," the coverage under this policy shall apply only in excess of the limits of insurance stated in the "scheduled underlying insurance." Under no circumstances shall we be required to drop down and replace the limits of insurance, or assume the obligations of a financially impaired insurer.

2. **Duties of the Insured**

a. In the event of an "incident" which has not resulted in a claim or suit.

Whenever you have information of an "incident" which involves injuries or damages likely to involve this policy, written notice shall be given by or for you to us or to our authorized agent as soon as practicable. The notice shall contain:

(1) Particular information sufficient to identify the insured;

(2) Such information as can be reasonably obtained with respect to time, place and circumstances of the occurrence or offense; and

(3) Names and addresses of the insured and of available witnesses.

b. In the Event of Claims or Suit

You shall provide us with written notice as soon as practicable whenever:

(1) A claim is made or "suit" is brought against you;

(2) You receive notice that a right to bring claim or "suit" against you will be asserted; or

(3) You obtain information that the obligation of "underlying insurers" to:

(a) Investigate;

(b) Defend;

(c) Pay on behalf of; or

(d) Indemnify

you has ceased.

Every demand, notice, summons, amended complaint or other process received by you or your representative shall be forwarded with each notice.

**3. Legal Action Against Us**

No legal action shall be brought against us unless you have fully complied with all the terms of this policy and the amount of your obligation to pay has been finally determined either by:

a. Judgment against you after actual trial; or

b. Written agreement between us, you and the claimant.

**4. Other Insurance**

This insurance is excess over and will not contribute with any other insurance available to the insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise. This condition does not apply to insurance purchased specifically to apply in excess of this insurance.

**5. Premium Audit**

a. We will compute all premiums for this policy in accordance with our rules and rates.

b. If the premium is shown in the Declarations as flat, the premium for this policy is not subject to adjustment.

c. If the premium is shown in the Declarations as adjustable, the premium shown as the advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured shown in the Declarations. If the sum of the advance and audit premiums paid for the policy term are greater than the earned premium, we will return the excess, subject to the minimum premium, to the first Named Insured shown in the Declarations.

d. The first Named Insured shown in the Declarations must keep records of the information we need for premium computation, and send us copies at such times as we request.

**6. Nonrenewal**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**7. Severability of Interests**

The insurance afforded applies separately to each insured against whom claim is made or "suit" is brought. However, the inclusion of more than one insured shall not operate to increase the limits of insurance.

**8. Annual Rating**

If this policy is issued for a period in excess of one year, the premium may be revised on each annual anniversary in accordance with our rates and rules in effect at that time.

**9. "Scheduled Underlying Insurance"**

Material change in premium for "scheduled underlying insurance" shall be promptly reported to us. Premium for this policy may be adjusted to reflect changes in underlying insurance in accordance with our manuals in effect at the time of the change.

**10. Maintenance of "Scheduled Underlying Insurance"**

While this policy is in force you agree that the policies listed in the Declarations as "scheduled underlying insurance" and their renewals and replacements shall be maintained, without alterations of terms or conditions, in full effect during the term of this policy; except for reduction or exhaustion of the aggregate limits of insurance in the "scheduled underlying insurance," provided that such reduction or exhaustion is solely the result of "incidents" taking place during this policy period, and not before. If you fail to maintain "scheduled underlying insurance," this condition shall not invalidate this policy. However, in the event of such failure, we will only be liable to the same extent as if you had complied with this condition.

**11. Appeals**

If you or your "underlying insurers" elect not to appeal a judgment in excess of the limits of insurance afforded by the:

a. "Scheduled underlying insurance";

b. "Unscheduled underlying insurance"; or

c. "Retained limit";

we may elect to appeal. Our limit of liability shall not be increased because of such appeal. We will, however, pay the following costs and expenses:

a. All premium bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy;

b. All premiums on appeal bonds required in such defended "suit," but without obligation to apply for or furnish such bonds;

c. Court fees;

d. Costs and expenses taxed against you by the appellate court and interest accruing after entry of a judgment against you and before we have:

   (1) Paid;

**(2)** Offered to pay; or

**(3)** Deposited in court

the part of the judgment that is within the applicable limit of insurance. Where the "underlying insurers" terminate their liability to pay interest on the judgment by an offer to pay their limits, you shall demand that such limits be paid. If the appeal is successful, such amounts not obligated to be paid shall be returned to such "underlying insurer."

### 12. Subrogation

In the case of any payments by us under the coverages of this policy, we shall be subrogated to all rights of recovery against any other party which you may have and will cooperate with you and all other interests. Amounts recovered shall be apportioned in the following order:

**a.** Amounts paid in excess of the payments under this policy shall first be reimbursed up to the amount paid by those, including you, who made such payments;

**b.** We are then to be reimbursed up to the amount we paid;

**c.** Any remainder shall be available to the interests of those over whom this coverage is in excess and who are entitled to claim such remainder.

Expenses necessary to the recovery of such amounts shall be divided between the interests concerned, including you, in the ratio of their respective recoveries as finally settled.

### 13. Settlement of Claims or Suit

We may pay, but are not obligated to pay, any part or all of the amount of the "retained limit" to effect settlement of a claim or "suit." Upon notification of the action taken you shall promptly reimburse us for such part of the "retained limit" that we had paid. All named insureds are jointly and severally responsible for our reimbursement and agree to make such reimbursement within 30 days after we give you written notice or demand for payment.

### 14. Sole Agent

The insured first named in the Declarations is authorized to act on behalf of all named insureds and other insureds with respect to:

**a.** The giving and receiving of notice of cancellation; and

**b.** Receiving return premium that may be payable under this policy.

The insured first named in the Declarations is responsible for the payment of premiums, but the other named Insureds jointly and severally agree to make

such payments in full if the insured first named fails to pay the amount due within 30 days after we give written notice or demand.

### 15. Trade Sanctions

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void ab initio (void from its inception) with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

**a.** Any insured, or any person or entity claiming the benefits of an insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

**b.** Any claim or "suit" that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or "suit" is prohibited by U.S. economic or trade sanctions;

**c.** Any claim or "suit" that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

**d.** Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

**e.** Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used in this policy a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this policy a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

### SECTION V – DEFINITIONS

1. **"Advertisement"** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition



a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding websites, only that part of a website that is about your goods or services for the purposes of attracting customers or supporters is considered an advertisement.

2. **"Automobile"** means

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads; including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "automobile" does not include "mobile equipment."

3. **"Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death, humiliation, shock, mental anguish or mental injury by that person at any time which results as a consequence of the bodily injury, sickness or disease.

4. **"Aircraft"** means a vehicle designed to transport persons or property in the air.

5. **"Impaired property"** means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

6. **"Insured contract"** means:

a. A lease of premises;

b. A sidetrack agreement;

c. An easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An indemnification of a municipality as required by ordinance, except in connection with work for a municipality;

e. An elevator maintenance agreement; or

f. The part of other contracts or agreements pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability to pay damages because of "bodily injury" or "property damage" to a third person or organization, if the contracts or agreements are made prior to the "bodily injury" or "property damage."

Tort liability means liability that would be imposed by law in the absence of contracts or agreements.

An "insured contract" does not include that part of a contract or agreement:

a. That indemnifies an architect, engineer or surveyor for an injury or damages arising out of:

(1) Preparing, approving or failing to prepare or approve:

(a) Maps;

(b) Drawings;

(c) Opinions;

(d) Reports;

(e) Surveys;

(f) Change orders;

(g) Designs; or

(h) Specifications; or

(2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

b. Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **a.(1)** above and supervisory, inspection or engineering services; or

c. That indemnifies a person or organization for damage by fire to premises rented or loaned to an insured.

7. **"Loading or unloading"** means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an "aircraft," "watercraft" or "automobile";

b. While it is in or on an "aircraft," "watercraft" or "automobile"; or

c. While it is being moved from an "aircraft," "watercraft" or "automobile" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the "aircraft," "watercraft" or "automobile."

G-15057-C
(Ed. 06/05)

8.  **"Mobile equipment"** means any of the following types of land vehicles, including any attached machinery or equipment:

  a.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

  b.  Vehicles that travel on crawler treads;

  c.  Vehicles maintained for use solely on or next to premises you own or rent;

  d.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    (1)  Power cranes, shovels, loaders, diggers or drills; or

    (2)  Road construction or resurfacing equipment such as graders, scrapers or rollers;

  e.  Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    (1)  Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    (2)  Cherry pickers and similar devices used to raise or lower workers;

  f.  Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

  However, self-propelled vehicles with the following type of permanently attached equipment are not "mobile equipment" but will be considered "automobiles":

    (1)  Equipment designed primarily for:

      (a)  Snow removal ;

      (b)  Road maintenance, but not construction or resurfacing; or

      (c)  Street cleaning;

    (2)  Cherry pickers and similar devices mounted on "automobiles" or truck chassis and used to raise or lower workers; and

    (3)  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

  However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "automobiles"

9.  **"Incident"**

  a.  With respect to "bodily injury" and "property damage," "incident" means an occurrence. An occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

  b.  With respect to "personal and advertising injury," "incident" means an offense arising out of your business.

10.  **"Personal and Advertising Injury"** means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

  a.  False arrest, detention or imprisonment;

  b.  Malicious prosecution or abuse of process;

  c.  Wrongful eviction from, wrongful entry into, or the invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

  d.  Discrimination, unless such insurance is prohibited by law;

  e.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  f.  Oral or written publication, in any manner, of material that violates a person's right of privacy;

  g.  The use of another's advertising idea in your "advertisement;"

  h.  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

11.  a.  **"Products-completed operations hazard"** includes "bodily injury" and "property damage" occurring away from premises an insured owns or rents and arising out of "your product" or "your work" except:

    (1)  Products in your physical possession; or

    (2)  Work not yet completed or abandoned.

  b.  "Your work" will be deemed completed at the earliest of the following:

    (1)  When all work called for in the "insured contract" has been completed;

    (2)  When all of the work to be done at the site has been completed if the "insured's contract" calls for work at more than one site; or



G-15057-C
(Ed. 06/05)

(3) When that part of the work done at a job site has been put to its intended use by a person or organization other than another contractor or subcontractor working on the same project. Work that may need:

(a) Service;

(b) Maintenance;

(c) Correction;

(d) Repair; or

(e) Replacement;

but which is otherwise complete, will be treated as completed.

c. This hazard does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it; or

(2) The existence of:

(a) Tools;

(b) Uninstalled equipment; or

(c) Abandoned or unused materials.

12. **"Property damage"** means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the occurrence that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

13. **"Suit"** means a civil proceeding in which damages because of:

a. "Bodily injury";

b. "Property damage"; or

c. "Personal and advertising injury";

to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding alleging such damages to which you must submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

14. **"Your product"** means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes warranties or representations made with respect to the fitness, quality, durability, performance or use of "your product" and the providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

15. **"Your work"** means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes warranties or representations made with respect to the fitness, quality, durability, performance or use of "your work" and the providing of or failure to provide warnings or instructions.

16. **"Retained limit"** means the amount stated as such in the Declarations. The "retained limit" is retained and payable by the insured as respects all "incidents" not covered by "scheduled underlying insurance" or by "unscheduled underlying insurance."

17. **"Scheduled underlying insurance"** means the insurance policies listed in the Schedule of Underlying Insurance including renewal or replacement of such contracts which are not more restrictive than those listed in the aforementioned Schedule of Underlying Insurance.

18. **"Ultimate net loss"**

a. "Ultimate net loss" means the actual damages the insured is legally obligated to pay, either through:

(1) Final adjudication on the merits; or

(2) Through compromise settlement with our written consent or direction;

because of "incident(s)" covered by this policy.

However, it includes the above mentioned sums only after deducting all other recoveries and salvages.

**b.** "Ultimate net loss" does not include the following:

**(1)** Costs or expenses related to:

**(a)** Litigation,

**(b)** Settlement;

**(c)** Adjustment; or

**(d)** Appeals;

nor costs or expenses incident to the same which an "underlying insurer" has paid, incurred or is obligated to pay to or on behalf of the insured;

**(2)** Pre-judgment interest;

**(3)** Office costs and expenses and salaries and expenses of the employees of an insured;

**(4)** Our office costs and expenses and salaries of our employees; or

**(5)** General retainer and/or monitoring fees of counsel retained by the insured.

**19. "Underlying insurer"** means an insurer whose policy covers "bodily injury," "property damage" or "personal and advertising injury" also covered by this policy but does not include insurers whose policies were purchased specifically to be in excess of this policy. It includes all insurers providing:

**a.** "Unscheduled underlying insurance"; and

**b.** "Scheduled underlying insurance."

**20. "Unscheduled underlying insurance"**

**a.** "Unscheduled underlying insurance" means insurance policies available to an insured, whether:

**(1)** Primary;

**(2)** Excess;

**(3)** Excess-contingent; or

**(4)** Otherwise;

except the policies listed in the Schedule of Underlying Insurance.

**b.** "Unscheduled underlying insurance" does not include insurance purchased specifically to be excess of this policy.

**21. "Watercraft"** means a vehicle designed to transport persons or property in or on water.

**22. "Authorized Insured"** means any named insured or any employee authorized by a named insured to give or receive notice of a claim or "suit."

**23. "Electronic data"** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**24. "Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**25. "Fungi or microbes"** means:

**a.** Any form of fungus, yeast, mold, mildew, or mushroom, including mycotoxins, spores, scents, byproducts or other substances produced or released by fungi; and

**b.** Any bacteria, virus, or any other non-fungal, single celled or colony-form organism, including any toxins, scents, byproducts or other substances it produces or releases, whose injurious source is in or on a building or its contents.

But "fungi and microbes" does not include fungi that were deliberately grown for human consumption, microbes that were transmitted directly from person to person, or microbes that caused food poisoning, if your business is food processing, sales, or serving.

**26. "Silica"** means the chemical compound silicon dioxide ($SiO2$) in any form, including dust which contains "silica."

**27. "Asbestos"** means the mineral in any form whether or not the asbestos was at any time:

**a.** Airborne as a fiber, particle or dust;

**b.** Contained in or formed a part of a product, structure or other real or personal property;

**c.** Carried on clothing;

**d.** Inhaled or ingested; or

**e.** Transmitted by any other means.

**28. "Volunteer worker"** means a person who is not your employee, and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**SECTION VI – DEFENSE PAYMENT AND RELATED DUTIES**

**1.** If a claim or "suit" alleges damages covered by underlying policies and the obligation of all "underlying insurers" either to:

**a.** Investigate and defend the insured; or

**b.** Pay the cost of such investigation and defense;

ceases solely through exhaustion of all underlying limits of insurance through payment of a combination



of covered expenses, settlements or judgments for "bodily injury," "property damage" or "personal and advertising injury" taking place during our policy period, then we will either:

   a.  Assume the investigation and defense of the insured against "suits" seeking damages; or

   b.  If we elect not to assume the investigation and defense in **1.a.** above, we will reimburse the insured for reasonable defense costs and expenses incurred with our written consent. However, such reimbursement excludes:

      **(1)** Office expenses of the insured;

      **(2)** Salaries and expenses of employees; and

      **(3)** General retainer fees of counsel retained by the insured.

2.  We will investigate and defend an insured or reimburse an insured for "suits" brought against an insured for a claim or "suit" that alleges damages because of "bodily injury," "property damage" or "personal and advertising injury" not covered under:

   a.  "Scheduled underlying insurance"; and

   b.  "Unscheduled underlying insurance";

   but which seeks damages because of "bodily injury," "property damage" or "personal and advertising injury" otherwise covered under this policy. Costs and expanses of such investigation and defense are not subject to the "retained limit."

3.  We will investigate and defend an insured or reimburse an insured for such costs of investigation and defense described in either **1.** or **2.** above, even if the allegations of a "suit" are:

   a.  Groundless;

   b.  False; or

   c.  Fraudulent;

   but only until we make payment or offer to pay or deposit in court that part of judgment(s) not exceeding our limit of insurance.

4.  We shall also have the sole right to make settlement of a "suit" as we deem expedient.

5.  If not permitted by law or otherwise to perform these duties, we will pay an insured for defense costs and expenses incurred with our prior written consent.

6.  Amounts we pay or incur pursuant to the obligation to defend or pay the costs and expenses of defense are in addition to, and not subject to, the limits of insurance stated in the Declarations.

7.  In addition to our limits of insurance, we will pay prejudgment interest awarded against an insured on that part of a judgment covered by this policy. We will not pay prejudgment interest on that period of time after we offer to pay:

   a.  Our limit of insurance; or

   b.  That portion of our limit of insurance which equals the amount of a settlement demand when combined with the limits of "underlying insurers."

8.  We will pay interest on a judgment that accrues after entry of that judgment, but before we have:

   a.  Paid;

   b.  Offered to pay; or

   c.  Deposited in court

   that part of the judgment that is within the limit of insurance of this policy. The amount of interest we pay will be in direct proportion that amount we pay as damages bears to the total amount of judgment. We will not pay additional interest that accrues after we have:

   a.  Paid;

   b.  Offered to pay;

   c.  Deposited in court

   that part of the judgment that is within the limit of insurance of this policy.

9.  We will pay all reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit." This includes actual loss of earnings up to liability $250. a day because of time off from work.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)

It is agreed that:

I.  This policy does not apply:

   A.  Under Liability Coverage to "bodily injury" "personal and advertising injury" or "property damage"

      1.  With respect to which an insured under this policy, is also an insured under a nuclear energy liability policy issued by the:

         a.  Nuclear Energy Liability Insurance Association;

         b.  Mutual Atomic Energy Liability Underwriters; or

         c.  Nuclear Insurance Association of Canada;

         or any of their successors, or would be an insured under any such policy but for its

G. "Nuclear reactor" means an apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

H. "Property damage" includes all forms of radioactive contamination of property.